Government. Arguments not to exceed 15 minutes per side. Mr. Stewart for the appellant. Good morning. I'd like to reserve five minutes for rebuttal. Very well. Appreciate the opportunity to be here. Thank you. Thank you, Mr. Stewart. You can come up to the podium, sir. You can come up to the podium. I appreciate the opportunity to appear before this court. I feel very privileged. I've been here previously. In fact, Paula Brown, my client, is seated on the row, the first row. And the I would start out with the fact that the U.S. Supreme Court has held that an employer's employee who has authority to punish or reprimand an employee, then the effective employee can pursue the claim versus the employer. And in the recent case that we filed subsequent to filing the original case, the Ball State University case, which was appealed to the U.S. Supreme Court, Justice Samuel Alito, who wrote the majority opinion, said for the university to be liable, Davis must have had the authority to hire, fire, demote, promote, transfer, or discipline Vance. And in that case, in this situation, Mr. Crow, one of the supervisors for the Lexington Fayette Urban County Government, had that authority and exercised that authority to discipline Paula Brown. So I just wanted to start with that premise, just to be sure. Let me ask you, before you get into your presentation, there are a couple of affidavits that you have submitted on behalf of Ms. Brown that discuss her work and the work environment from 2005 to 2007. If the conduct that is at issue in this case occurred in 2008, what's the relevance of the 2005 to 2007 affidavits? The talk about what happened in the work environment then. It's related to the fact that Paula Brown had been working and was assigned a job once she was returned to work in the fall of 2008, that she was told that she had to do all of the work that was there. It was just a mass amount. In fact, pictures were filed as part of the exhibits where it showed just maybe a hundred files that were sitting in there that had not been touched while she was gone. And then the affidavits of Christine Wu was actually referenced in the opinion that this court, Sixth Circuit, filed about the workload and how, after Paula Brown was terminated, that work was assigned to three different people. We have the Hoagland affidavit and the Asher affidavit. Both of those folks left in 2007. The issue before us is not whether your client had a prima facie case. That was the first appeal. It's whether the employer's reasons for terminating her were pretextual. And that issue is specific to 2008, I believe, which is, if I'm remembering right, when she was terminated. That's correct. I would just sort of echo her question. What do affidavits from people who left in 2007 have to do with whether reasons were pretextual in 2008? Well, from the standpoint of what Paula Brown had encountered previously under the working relationship that she had with the supervisors, and he was there to observe and, you know, for the benefit, and he was in a position as one of the bosses of the department prior to the time he retired. I don't want to use all your time on that, so I'll get you off of your argument, but you may proceed to other things. All right. Your Honor, if one of the things I think that should be reviewed specifically, and so that I don't have to spend time going through it, but is the various key opinions that this court rendered relative to the fact that, you know, the case should not have been handled and disposed of by the judge, but, in fact, that was a jury decision. And this court was very specific about that in several places in that opinion. So just the relative to some of the situations while serving under the supervision, and this was the court's opinion of defendants Dewey Crowe, George Dillon, and Stephanie Northington, Brown complained to an employee assistant program specialist about the bullying behavior. And they went through the details of that and stating that, according to the co-worker, when Brown was confined to a wheelchair after an injury, well, Dillon, another one of the employer managers, instructed the co-worker not to assist her. And it goes on from there to the fact that when the plaintiff filled out an employee grievance form in which he sought to hold defendants Brown, Dillon, and Crowe accountable for unethical behavior of falsifying, signing, and filing a legal document, she made a complaint about that. Let me interrupt you first. Yes, Your Honor. And you're complaining about the summary judgment that was entered against your client, correct? Yes, that's correct. And you say that that was inappropriate or improper because there existed a genuine issue of material fact as to something. Tell me what the genuine issue of material fact is that you allege makes summary judgment improper in this case. Well, this court itself stated that specifically and that it was not a case to be tried on summary judgment. But in repeating that, when we come to the fact that on page five of that opinion, and I just there to quote, Brown disputes Crowe's version of the events of that day. However, in filing the district court, she set out the version of the incident. In her attempt to more quickly complete at least ten forms, she asked a co-worker who was sitting idly waiting for the phones to ring to number the forms while she continued to fill in the contents. And Crowe began smacking his fist and shouting, I told you to stop asking other people to do your work for you. But what I'm trying to get you to do is sort of focus like a laser on the question. Yes. And so I want you to complete this for me. Summary judgment is inappropriate in this case because a genuine issue of material fact exists as to whether fill in the blank. And whether or not the supervisors mistreated Paula Brown in their writings, their action. For instance, her immediate supervisor, Ms. Northington. But just mistreatment is not grounds for necessarily for action under Title VII. There's got to be some kind of retaliatory or discriminatory conduct. And that's what occurred, Your Honor. It was determined that this was in fact discriminatory action against her because in the department there were 40 white individuals at the time she was employed there. Four blacks were there. And at the time that she was terminated on December the 31st of 2008, then the next day there were no blacks in the department at all and just the remaining 40 whites who were there. And the action was specifically, you know, appointed as this court ruled and on multiple pages of its opinion that it issued back just last year in June of 2012. It's undisputed, though, that Ms. Brown three times refused to obey Crow's order not to ask the receptionist for help during this one blow-up that was part of the basis for her termination. That is true, though, right? She thrice refused to follow the order. Yes or no, is that true? She did whatever work was assigned to her. I'm asking you, is that true? She three times refused to follow the supervisor's order on that occasion? She denies that she refused to do it. She didn't? She wasn't so instructed, I guess? There was a letter that came out about the work that she should do, supposedly written by Ms. Northington, who didn't have the qualifications for her position. But in that letter, when it was actually filed, we found that in her testimony was that she didn't sign that letter and that the original date was dated in May of 2008. Pages two and three, though, were dated November the 20th. Thank you, sir. You all have your time. Judge Daughtry has a question. Oh, I'm sorry. Judge Daughtry, did you have any questions? No, not so far. Thank you. Thank you. We'll hear from the county. May it please the Court, Mr. Stewart. I'm Tracy Jones, and I'm here for the Urban County Government. And I'm too pleased to be here this morning to talk about this case that's been going on for some time. First, I think I would like to refocus on what I believe the issues are for this appeal, since we've already been here once before. It's my understanding, based on this Court's June 12, 2012 opinion, that the issues that were addressed by the District Court on summary judgment were, for the second time, were whether or not the suspension that Ms. Brown was given on May 1, related to an incident of May 1, 2008, and whether or not her referral for evaluation for her ability to perform her work duties in July of 2008 were retaliatory in nature for her filings of an EEOC complaint based on race and sex under Title VII. Those are the issues that this Court sent back. Those are the issues that we addressed in our motion for summary judgment in the District Court. And then those were the issues that the judge there granted summary judgment on the second time around. So since those were the issues sent back by the Court before, what's different now? And specifically, Ms. Brown alleges that Lexington took action against her fairly immediately after she engaged in this protective conduct. Couldn't a jury infer, because of temporal proximity, that those two things are related? Well, Your Honor, that I think was the issue that the Court considered when we sent it back. And when it came back, it was my understanding that the reason that it came back was because the judge had determined that there wasn't a prima facie case established. And this Court thought that there was on those issues. However, we did not argue, because it was dismissed that early, on the pretext argument. So when we refiled our summary judgment motion, we argued that although there was some temporal proximity there, that there was also a very clear, legitimate, non-discriminatory reason for the suspension that occurred related to the incident in May. And in arguing that, we talked about the issue of the blow-up at work. In fact, I think there is no factual dispute, if you look at depositions and you look at the affidavit of Mr. Crow, as well as the deposition of Ms. Brown, that despite their disputes or inability or whatever was going on with their ability just to get along in the workplace, he was the director and he did ask her to perform duties that were related to her job on three different occasions, and she didn't do those. And that was his basis for suspending her, because that directly impacted a customer, which is the nature of that division's work. And that provided a reasoning. Let me just ask you on that point. One of the things she says is that the quantum of work assigned to her was disproportionate to any other employee in that division that she was given more work than she could reasonably or possibly do. What she's saying, basically, is she was set up for failure. When she protested, then there were these actions, reactions by her supervisor. So what she says, in essence, is that she was treated disparately in the quantity of the work. It was impossible for her to perform. And then when she protested, it brought on the blow-up. If that's her argument, and this sort of, I guess, precipitated the blow-up, what does that do to your argument? Well, Your Honor, I believe that the work that she was doing as issuing these permits, which is part of that division's work, was going on before she made an EEOC complaint. And there's been no evidence introduced that it was drastically increased or in any fashion after that. And the work was completed later that day by other people fairly quickly, according to Mr. Crowe's affidavit. So it was really not an issue about the work. It was an issue about their working relationship, which isn't a basis for Title VII retaliation. And that really wasn't the basis of her complaints when he was asking her to do the work. She just didn't like the way he asked her to do it and continued to go back and forth with him and with the deputy director rather than help the customer. Are you talking about the incident that involved Ms. Wu? Yes, that is the incident where she was asking her to do it. What about Ms. Wu's affidavit where she says Crowe was overly belligerent and threatening and Wu herself left the building crying, et cetera? I mean, isn't there a genuine issue as to sort of who was at fault in that incident then? Well, I think the question would be even if that were true, whether or not if he was behaving in that way, it was being directed at Ms. Brown as a result of retaliation for the CEOC complaint. In Mr. Crowe's affidavit, while he says he was aggravated, he says he was aggravated because he kept having to ask that the work be done and also that it wasn't getting done and that a customer was waiting. So I don't think that there is evidence that even though he may have been mad, and I'm not going to tell the court that he probably wasn't because he probably was, that it was a basis for retaliation. It was a basis for getting the work done on that particular occasion. And much the same true when she was sent to EAP, which is the Employee Assistance Program for an evaluation for her comp, which is the other issue I think that is back in front of this court, as to whether or not Ms. Brown has established pretext for that, the reason we gave. The reason you gave is these e-mails, and I would imagine particularly the June 24, 2008 one? That would be correct, Your Honor. That e-mail in conjunction with the other ones that came in, as well as the interactions between her supervisors, her co-workers, and the Division of Human Resources that was regularly encountering her, there was some concern particularly based on that one and the things she expressed as to whether or not there was something going on with too much stress that was going to impact her ability to do her work. Again, there was a reason established for that. It is not uncommon under those types of circumstances. And it wasn't based on retaliation, and there wasn't any evidence to the contrary introduced by Ms. Brown that it was. So when she came back to work, there was even some effort, although that has been made into an issue that the plaintiff is arguing it was retaliation. I would imagine in this case to try to work with that doctor who did keep her off work for several weeks to reintegrate her into the workplace, not to retaliate against her, and to pay her for the period of time while they were trying to do that. One thing I do want to... But paying her wasn't immediate. I mean, wasn't there some lag in the time? There was some lag in the time. Once the employee is sent to the Employee Assistance Program, if the medical doctor that sees them or the medical provider determines to take them off work, normally, not just Ms. Brown, but most employees are asked to use their sick time or whatever they have during that time period. The issue here, because that's out of the government's hands, once the medical providers say, you know, I need to do further evaluation or I think this person needs some more time from work, we can't intervene and say, no, we want you to send them back. We have to wait until they say it's okay with us to come back. Once that decision was made, and we attached emails from Ms. Jarvis, who was the manager in Human Resources handling this, to the director of Human Resources saying they have determined to return her to work, at which point it did come back into our court. And we have some questions for him based on what he reported to us about the best way to do that so we don't have any more of these blow-ups at work. And the doctor was on vacation. So they, at that point in time, and I think the email is dated September 1st, from Ms. Jarvis to Mr. Allen, said, let's go back and let's not only pay for the time we're going to spend trying to talk to the medical provider, but let's go ahead and just pay the entire time that she was off. So the payment wasn't made immediately, but I don't think that's the issue while the doctor was keeping her off. When the government extended that time to talk with the doctor, she was paid. So, again, there's been no evidence to contradict that, and I think that's what the district court judge was saying in his opinion, is that once those reasons were put out there, there has to be some type of an argument put forth by the plaintiff and some evidence to show that those really aren't legitimate reasons. Additionally, and the plaintiff filed this case, or the appellant filed this case, as an additional authority that came out after we briefed this matter, the case of the Nassar case that was issued and changed the standard back to the but-for issue on. But for the issues that we've presented, those things would not have occurred. I'd just like to ask you, I understand why the reason for referring her to the doctor, but what exactly, just so I understand your argument, what exactly is the reason for the termination itself? The reason for the termination was subsequent issues and complaints that came from customers and her ability to serve them after she came back. Although it was my understanding from this court's opinion in June of last year that the termination was so far removed from the activity that it wasn't going to be considered as retaliation. All right. Okay. All right. So the only retaliatory action we're dealing with here is the referral? And the suspension. Right. That's my understanding from the opinion in 2012 that sent the case back to the district court. Okay. Thank you. If you look at the Nassar case, which is different than what we briefed because it came out later, I think it does change the standard back to what it was or more definitively clarifies what it is. And I think if a review of our pleadings and the opinion from the district court show that since there have been no other real reasons put forward other than the reasons that the government has issued about it's not unreasonable, and we cited cases in our briefs that talked about just suspending someone or disciplinary action for instances that clearly violate the policies are not adverse or are not necessarily retaliatory. So therefore, we established a good reason with that and there's nothing that has been put forth to show that that was pretextual. The same thing would be true in regard to the referral and the time off related to that. The same standard would now apply under the Nassar case and we put forth those reasons both from the medical rationale, which is in this file. It's under seal, the report from the physician, but it is in the file along with the affidavit and the emails and things from Ms. Jarvis, who is the HR person that was handling that. One more question. Mr. Stewart says that his client disputes that she disobeyed orders three times in the Crow incident. What's your response to that? The best thing I can tell you, Your Honor, about that is we included in our brief, and it's also attached as exhibits in the record for the summary judgment, the deposition transcript. Whose? Ms. Brown's. She talks about when he first approached her that she got upset. She talks about leaving, going to the deputy director. She talks about coming back. She talks about Mr. Crow coming back and telling her again. Then she talks about leaving her workstation entirely and going to the other building. Again, while their dispute may be as to each other, how they related to each other, which isn't a Title VII violation, there is no dispute that he asked her on at least three occasions that day, and those permits were not done. And that's further evidenced by the fact that other people had to do them later on, and the customer was still sitting there. Let me ask you, couldn't a jury infer retaliatory intent based on the fact that Jarvis refused to ever meet with Brown to discuss her suspension or to schedule the appeal of her suspension? Couldn't a jury infer retaliatory intent from those actions or inactions? I don't believe so, Your Honor, because Ms. Jarvis, there is evidence in the record, both from e-mails back and forth, that she was engaging with Ms. Brown. That she was not? No, that she was talking with her, e-mailing her back. She was out for a period of time based on the doctor, so I believe that there was no way they could meet there. And the appeal actually was part of the termination hearing because she was gone during the time the termination hearing would have been scheduled. But when she returned, or when the suspension hearing would have been scheduled, when she returned to work, then they had to reschedule it, which put it in line with the termination. So I don't believe that that would be accurate. You're saying that if a person is suspended because they are suspended, the hearing would be put off until they somehow got back and the suspension was ended? You couldn't schedule it? That normally is how it works at the government. They have hearing dates because it's a civil service hearing, which involves a panel of citizens, and they're scheduled once a month. And so they sometimes get scheduled far out. Thank you. Judge Autry, do you have any questions? I don't, thank you. All righty. Thank you for your arguments. We'll hear Mr. Stewart's rebuttal. Your Honors, in the affidavit that Paula Brown had filed, she denied the fact that she turned this down three times, and that is in the record. And it's, I think, extremely important to look at the fact that the letter that the supervisor wrote, that was Ms. Norlington, was, you know, not something that she had done. And she testified and admitted that she had not signed the letter. And it was a letter that obviously was created fictitiously because of the dates that were on the letter, as I said, originally with the May date and then the subsequent dates on pages two and three showing that it was not written until, I think, November the 20th. Mr. Stewart? Yes, ma'am. Can you tell me where in the record that letter appears? I know I've seen it. I can't find it. Do you have a reference in your materials, or should I just keep looking? Your Honor, let's see. There was a one-letter dated December the 5th. Oh, let's see. I think I have it represented, a note that I believe it might have been in Norlington's deposition at pages maybe 67 and 68. In fact, that's where Norlington testified that she didn't sign that letter. All right. Thank you. All right. Mr. Stewart, I'd like to ask you. Yes, sir. First, do you agree that the only retaliatory actions at issue here are the suspension and the referral? Well, the suspension, the referral, and the termination itself. Yes, sir. Ms. Jones said the termination is not at issue here. It's the suspension and referral. Do you disagree with that? The retaliation, what? Ms. Jones said the termination itself is not at issue in this case, only the suspension and referral. But you're saying you disagree with that, sir? I disagree with that statement because it was as a result of action that had occurred against her previously and documented. Okay. That doesn't surprise me. With regard to the referral itself, I mean, when one reads this June 24th email from your client to several folks, Lane, Blevins, and James, I mean, are you saying it's pretextual after somebody gets this email to have a concern about that person's mental well-being? Your Honor, with the situation and the amount of work that was being done and the fact that my client dealt with 5,000 customers a year, and when the actual accusations were made against her where individuals were presented, and there were three individuals presented by the Lexington-Fayette-Irvin County Government, and the content of their testimony relative to Ms. Brown was not, two of them, was not contesting or challenging what she didn't do at all. Just that one of the individuals among the three was an individual that her supervisors had said that if that lady came in, then she was to be referred to one of the other individuals who worked in that department. And in another situation, the second situation, at the time, Ms. Brown had gone to the restroom prior to the time that the customer wanted to be seen. But in dealing with all the others, and many times, and she said that of the nine employees that were in that department, there might be five of them in the back room or outside smoking, and she had the responsibility for handling all of that. And with dealing with 5,000 people, customers, and there being three, not even complaints, actually, the individuals that they called, there were only three, and she was one of the, you know, top performers in that department. Thank you. Any questions from Judge Daughtry or Judge Donald? No, thank you. Thank you, sir. Thank you. Both of your arguments.